**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

DONALD TERRY MOORE,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Petitioner,⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀NO. 3:06-00333
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀JUDGE HAYNES
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
RICKY BELL, Warden,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Respondent.⠀⠀⠀⠀⠀⠀⠀)

**M E M O R A N D U M**

Petitioner, Donald Terry Moore, filed this action under 28 U.S.C. § 2254 seeking to set

aside his state convictions for rape of a child, aggravated assault and simple assault for which he

was sentenced to twenty-seven and a half years and was assessed a fine of fifty-six thousand

dollars ($56,000). After a review, the Court concluded that the Petitioner's claims were not

frivolous and ordered the Respondent to file a response. In earlier proceedings, the Respondent

moved to dismiss the petition as untimely, but the Court denied the motion without prejudice and

appointed the Federal Public Defender to represent Petitioner with leave to file an amended

petition. (Docket Entry No. 8). After Petitioner filed an amended petition (Docket Entry No.

13), Respondent renewed his motion to dismiss and that motion was denied. (Docket Entry Nos.

36 and 37).

In his amended petition, Petitioner asserts the following claims: (1) Petitioner was denied

due process by the State's failure to provide the defense with a samples of the saliva swab for

independent testing; (2) Petitioner's counsel was ineffective for failing to arrange for independent

testing of the saliva swab that was taken from mouth of alleged victim that trial counsel; (3) was

ineffective for his failure to make the closing argument that the victim admitted Petitioner did not

ejaculate during the rape; (4) there was insufficient evidence for Petitioner's rape of a child conviction; (5) Petitioner's trial counsel had a conflict of interest; (6) Petitioner's indictment contained multiplicity of counts for the same conduct; (7) The trial court applied the wrong sentencing range for Petitioner's sentence; and (8) Petitioner's sentence was improperly enhanced in violation of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) (Docket Entry No. 13, Amended Petition).

## A. Procedural History

On June 9, 1995, a state jury convicted Petitioner of one count of rape of a child, one count of aggravated assault for which he received a sentence for twenty-seven and a half years, and two counts of simple assault in the Criminal Court of Davidson County, Tennessee. On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions. <u>State v. Donald Terry Moore</u>, No. 01CO1-9702-CR-00061, 1998 WL 209046 (Tenn. Crim. App. Apr. 9, 1998). The Tennessee Supreme Court granted his application for permission to appeal and upon review, found that the trial court's failure to grant a severance was harmless error and affirmed Petitioner's convictions. <u>State v. Donald Terry Moore</u>, 6 S.W.3d 235, 242 (Tenn. 1999). Petitioner did not seek review in the United States Supreme Court.

Petitioner filed a petition for post-conviction relief that the trial court denied in a twenty-seven page memorandum (Docket Entry No. 45-12, Technical Record at pp. 36-62)[1] and on appeal, the Tennessee Court of Criminal Appeals affirmed. <u>Donald Terry Moore v. State</u>, No. M2002-02417-CCA-MR3-PC, 2004 WL 1144015 (Tenn. Crim. Appl May 21, 2004). The

---

[1]This citation to pages reflects the page numbers assigned by the Court's electronic filing system.

Case 3:06-cv-00333  Document 50  Filed 07/30/09  Page 2 of 29 PageID #: 2097

Tennessee Supreme Court denied review and Petitioner did not seek review in the United States Supreme Court.

## B. Discovery Requests

Of the issues before the Court, Petitioner requests discovery and an evidentiary hearing is necessary. Both issues are interrelated, in part because Petitioner requests DNA testing of the saliva swab cited in his claims.

Since 2001, DNA discovery has ben available under state law for post-conviction proceedings, the "Post-Conviction DNA Analysis Act of 2001." Tenn. Code Ann. § 40-30-301 et seq. Under this Act, notwithstanding the provisions of part 1 of this chapter, or any other provision of law governing post-conviction relief to the contrary, **a person convicted of** and sentenced for the commission of first degree murder, second degree murder, **aggravated rape**, of any of these offenses, **any lesser included offense of these offenses,** or at the direction of the trial judge, any other offense, **may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence"**. Tenn. Code Ann. § 40-30-303(emphasis added).

During the time of Petitioner's post-conviction proceeding in 2001 and 2002, this discovery mechanism was available to Petitioner. The record reflects that the state trial court granted Petitioner's counsel access to the laboratory testing. (Docket Entry No. 451-12, Technical Record at p. 20, Order). The issues of laboratory testing and preservation of the semen and blood were decided in Petitioner's direct appeal. Moore, 1998 WL 209046, at **9-11. The

3

Tennessee Court of Criminal Appeals addressed these issues and ruled as follows:

> The defendant next contends that his constitutional rights were violated by the State's failure to perform a blood typing test and by the State's failure to preserve the semen sample for further testing. He submits that such failures amount to a suppression of evidence in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. We do not agree.

> The defendant voluntarily submitted saliva and blood samples so that his DNA might be compared to the DNA which was in the semen found in the victim's mouth. **However, as pointed out above, the DNA tests performed by the TBI were inconclusive due to the small amount of DNA present in the semen sample. The defendant argues that the TBI lab should have performed an ABO blood typing test and should not have used all the semen sample on the DNA tests.**

> **Joe Minor, who performs DNA testing for the TBI, testified that he had used the RFLP technique in testing the DNA found in the semen sample. However, because the amount of semen was small, he was unable to visualize the DNA using the RFLP process. Thus, he was unable to make a comparison between the DNA taken from the defendant's voluntary samples and the semen. He testified that after he performed his analysis, the remaining portion of the sample was sent to a second lab for PCR testing, the other technique now being used to identify DNA. He testified that the results of that test were inconclusive as well.**

> **Minor further testified that an ABO blood typing test could have been performed prior to the DNA tests, but could not have been performed after because the sample had been depleted. However, he testified that the TBI lab was no longer performing the ABO test because of the large amount of sample it consumed and because DNA testing provided a better exclusionary tool than the ABO test. As a result, the ABO test was not performed.**

> This Court has previously held that the State is not required to perform any test. State v. Greg Lamont Turner, No. 01C01-9503-CR-00078, Davidson County (Tenn.Crim.App. filed Aug. 25, 1995, at Nashville) (no perm. app. filed). In that case, the defendant had argued that the State's failure to perform DNA testing and the failure to preserve blood samples violated his due process rights. This Court rejected that argument, stating:

> First, the state is not required to perform any type of test. However, the failure to perform a material test may be shown through the cross-examination of the appropriate state witness since it reflects upon the quality of the state's case.

4

**Second, there is nothing in the record that indicates the appellant sought to preserve the blood samples for possible testing prior to trial. Third, assuming the blood was available, the only evidence contained in the record establishes that the testing would be inconclusive.**

Following this reasoning, we find that this issue has no merit. **In the present case, the defendant did cross-examine Joe Minor about the availability of the ABO test and about the decision not to perform the test, thus, the defendant had the opportunity to attack the quality of the State's case. While the defendant did request preservation of the sample, the sample was so small that compliance was impossible. And finally, Minor testified that he had performed the DNA testing rather than the ABO testing because the DNA test is more exclusionary. Thus, it is reasonable to infer that if the DNA test could not produce a conclusive result, it is unlikely that the ABO test could have. Thus, we conclude that the State withheld no evidence and that the defendant's constitutional rights were not violated.**

Moore, 1998 WL 209046, at ** 9-10 (emphasis added).

In his post-conviction proceeding, Tennessee appellate court ruling reflects another

review of this DNA testing issue in the context of an ineffective assistance of counsel claim, the

Tennessee Court of Criminal Appeals concluded as follows:

With regard to the petitioner's claim that his trial counsel should have obtained a fluid sample for DNA testing, **the post-conviction court determined that the petitioner had failed to establish that he was prejudiced because the results of DNA testing conducted by the state were inconclusive rather than inculpatory**. With regard to the claims concerning the testimony of Leon Gardner, the post-conviction court determined that because a curative instruction was given after the offending testimony, a mistrial was not warranted. The post-conviction court determined that the petitioner failed to establish that "had trial counsel investigated the issue of whether [Leon Gardner] was ... the perpetrator, such an investigation would have yielded the evidence the [p]etitioner claims exists." The post-conviction court concluded that trial counsel "attacked the credibility of the testimony presented by the [s]tate's witnesses in every conceivable way." The post-conviction court also observed that questioning of Attorney Ray at the evidentiary hearing "revealed his extensive knowledge of the case."

Moore, 2004 WL 1144015, at *2 (emphasis added).

5

Rule 6(a) provides the Rules Governing Section 2254 Action provides for discovery

under a good cause standard.

> "A party shall be entitled to invoke the processes of discovery available under the
> Federal Rules of Civil Procedure if, and to the extent that, the judge in the
> exercise of his discretion and for good cause shown grants leave to do so, but not
> otherwise."

As stated by the Sixth Circuit in Stanford v. Parker, 266 F.3d 442 (2001), in a habeas action as a

general rule:

> Habeas petitioners have no right to automatic discovery. A district court has
> discretion to grant discovery in a habeas case upon a fact specific showing of good
> cause under Rule 6. See Bracky v. Gamley, 520 U.S. 899, 117 S.Ct. 1793, 138
> L.Ed.2d 97 (1997); Byrd v. Collins, 209 F.3d 486, 515-16 (6th Cir. 2000) . . . The
> burden of demonstrating the materiality of information requested is on the moving
> party. See Murphy v. Johnson, 205 F.3d 809, 813-15 (5th Cir. 2000).
> The district court applied the correct legal standard in light of the evidence and the
> state court proceedings. The discovery sought by Stanford would not resolve any
> factual disputes that could entitle him to relief, even if the facts were found in his
> favor. To the contrary, Stanford's requested discovery, when reviewed in light of
> the recently examined record, falls more in the category of a fishing expedition.
> We will not find that a district court erred by denying a fishing expedition
> masquerading as discovery.

Id. at 460.

Moreover, "[c]onclusory allegations are not enough to warrant discovery under [Rule 6];

the petitioner must set forth specific allegations of fact." Ward v. Whitley, 21 F.3d 1355, 1367

(5th Cir. 1994). In Williams v. Bagley, 380 F.3d 932, (6th 2004), the Sixth Circuit explained that

for discovery in a habeas action is permissible "where specific allegations before the court show

reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate

that he is ... entitled to relief."

Discovery must also be considered in the context of 28 U.S.C. § 2254(e)(1) on the

6

presumptive correctness of state court finding.

> Because Petitioner failed to rebut the statutory presumption of correctness that the federal habeas court must award to the factual findings of the state courts, the district court properly concluded that it was required to defer to those factual findings. Furthermore, given this conclusion, we would be hard-pressed to say that the district court abused its discretion in denying further discovery on these issues.

Byrd v. Collins, 209 F.3d 486, 516 (2000). Consideration of Section 2254(e)(2) on failure to develop the state record and the precedents thereunder, discussed infra, are also relevant given that discovery is intended to supplement the state record.

Petitioner has not shown any reason why the DNA testing of saliva sought here, was not pursued in his state post-conviction proceeding as authorized by state law. Petitioner's counsel was given access to the testing in his state post-conviction proceeding. The Court concludes that to grant this discovery for additional testing allows Petitioner to circumvent the express state process. The state appellate court's findings cite expert testimony that there is not any likelihood of any reliable testing from the fluids. Petitioner has not presented any reason to challenge these state court findings based upon expert testimony. In these circumstances, the Court concludes that Petitioner's request for discovery should be denied.

### C. Evidentiary Hearing

As to the Petitioner's request for an evidentiary hearing, in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, Congress redefined the standards for conducting an evidentiary hearing in a habeas action in amending Section 2254 to provide as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless

7

the applicant shows that - (A) the claims relies on - (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C.§ 2254(e)(2).

In <u>Williams v. Taylor</u>, 529 U.S. 420 (2000), the Supreme Court stated that under Section 2254(e)(2), the initial focus on whether to conduct an evidentiary hearing, is whether the petitioner exercised diligence in developing the state record and that diligence depends, in part, on whether the petitioner or his counsel knew of the matters at issue and failed to pursue the matter in the state courts:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts . . . <u>Diligence for purposes of the opening clause [of Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court</u>; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.
>
> * * *
>
> For state courts to have their rightful opportunity to adjudicate federal rights, <u>the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.</u>
>
> * * *
>
> Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

<u>Id.</u> at 435, 437 and 439-40 (emphasis added).

8

Independent of § 2254(e)(2), the Court possesses the inherent authority to set an evidentiary hearing in a habeas action. Harries v. Bell, 417 F.3d 631, 635 (6th Cir. 2005); Abdur'Rahman v. Bell, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." Abdur' Rahman, 226 F.3d at 705. Such hearings are set "to settle disputed issues of material fact." Id. at 706. This authority extends to where an inadequate record exists to decide a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Yet, "[i]f [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings,[the court] may, and ordinarily should accept the facts as found in the hearing. But [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Abdur'Rahman, 226 F.3d at 705 (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). Moreover, the Supreme Court has stated that: "The state court is the most appropriate forum for resolution of factual issues in the first instance and creating incentives for the deferral of fact-finding to later federal court proceedings can only degrade the accuracy and efficiency of judicial proceedings." Id. at 9. Accord Byrd v. Collins, 209 F.3d 486, 516-17 (6th Cir. 2000) (quoting Keeney).

In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order an evidentiary hearing is whether "a petitioner is entitled to a hearing [under § 2254(e)(2)] . . .

9

versus whether a district court has the inherent discretion to order a hearing [that] is still intact following Williams." Abdur'Rahman, 226 F.3d. at 706.

Here, Petitioner has not presented any facts that challenge the state courts' findings that this DNA would produce any results that would seriously challenge the State's proof. The only expert proof is that the fluid samples tested were too small to provide any meaningful testing. Petitioner had an evidentiary hearing on his ineffective assistance of counsel claim. A transcript of that hearing was not part of the State appellate record due to the omission of counsel in the post-conviction appeal. Yet, the state trial court made extensive factual findings and Petitioner did not cite any other facts to warrant a hearing.

The Court concludes that Petitioner has not shown the justification for another evidentiary hearing.

### D. Review of the State Court Record

In the direct appeal, the Tennessee Court of Criminal Appeals made the following findings of fact.[2]

> While the defendant has challenged only one of his convictions on a sufficiency basis, we nevertheless find it useful to recite the facts of this case. The defendant and one of the victims, Ruth Moore, were married in 1990. In July 1993, the couple, along with Moore's children, Leon Gardner and the other victim, L.G.,FN2 moved into a home at 818 Stockell Avenue in Nashville. Several witnesses testified that after the foursome moved to the Stockell address, Gardner and the defendant had had difficulties getting along.
>
> > FN2. The policy of this Court is to withhold the identity of young children involved in sexual abuse cases, identifying them only by their initials. See State v. Schimpf, 782 S.W.2d 186, 188 n. 1

---

[2] State appellate court opinion findings can constitute factual findings in a habeas action . Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(d)

10

(Tenn.Crim.App.1989).

In August of 1993, L.G. alleged that the defendant had forced her to engage in cunnilingus with him. This charge was the basis for count eleven of the indictment. At trial, L.G. testified that sometime in August of that year, she had been asleep in her bedroom when the defendant entered and put his hand over her mouth. She said that he had told her to be quiet, then he removed her shorts and underwear. L.G. then testified that the defendant had "put his tongue in [her] private." She further testified that the defendant had touched her breasts.

L.G. stated that after this had occurred, she went to the bathroom and called for her mother. She testified that she told her mother what had happened. Following this conversation, the defendant then forced L.G. and Ruth Moore into the car and drove them to Ruth Moore's sister's house. Moore testified that she had returned to her home two days later but that L.G. had remained with her sister at the instruction of the Department of Human Services (DHS). Moore further testified that she had spoken with officials at DHS and had told them that she suspected L.G. had made up the story in order to divert attention from the disputes between Leon Gardner and the defendant. Accordingly, Ruth Moore stated that she had been glad when DHS decided not to prosecute the defendant. L.G. returned home in mid-November shortly after Ruth Moore learned that DHS was not further pursuing L.G.'s allegations.

The remaining counts of the indictment stem from a series of events that occurred in the early morning hours of November 27, 1993. Testimony at trial established that the defendant, Ruth Moore, and two friends, Betty Douglas and Freddie West, had gathered at the Moore household. L.G. along with Douglas's son and nephew had also been present. Leon Gardner had been in and out of the house that evening. Moore testified that the adults, with the exception of Douglas, had been drinking beer that evening. While Moore testified that she had had two or three beers, Douglas testified that Moore had been drunk and "out of control." Both women testified that during the course of the evening several arguments had erupted. Moore testified that she had argued with the defendant and with her son, Leon Gardner. She further testified that after she and Gardner had argued, she had called the police. Apparently, by the time the police arrived, Gardner had left the house and no police action was taken. When Gardner later returned to the home, Douglas offered to take him home with her so that no more arguments would occur. Douglas, Freddie West, and Gardner then left the Moore home sometime between one and two o'clock on the morning of November 27, 1993. L.G. and Douglas' son and nephew were left sleeping in L.G.'s bedroom, and Ruth Moore was asleep on the couch.

L.G. testified that some time after she had fallen asleep, the defendant had entered

11

her bedroom and had begun to choke her. She said that he then carried her into her mother's bedroom where he continued to choke her. Ruth Moore testified that she had heard a strange noise and had left the couch to see what was happening. As she entered her bedroom, the defendant hit her in the head with a hammer. The defendant then forced Moore and L.G. to crawl out of the bedroom, down the hall, and into Leon Gardner's bedroom. Once there, the defendant forced Moore to crawl under the bed. Moore testified that she had been frightened and had urinated on herself because the defendant would not allow her to go to the bathroom. From this bedroom, the defendant then forced Moore and L.G. to crawl to the basement.

Moore testified that once they were in the basement, the defendant used an extension cord to tie her to a pole. She further testified that he had again hit her with the hammer and then left the basement taking L.G. with him. L.G. testified that the defendant had taken her to the top of the basement steps, had unbuttoned her pants, and had put his finger inside her vagina. She told the court that the defendant had then taken her into the dining room, had forced her down on her knees, and had put his penis in her mouth. Moore testified that she had been able to free herself from the pole and had emerged from the basement. L.G. testified that when the defendant had heard Moore coming, he stopped forcing her to perform fellatio. Moore testified that when she had encountered the defendant, the two struggled for the hammer, and she had been able to hit the defendant once before he regained possession of the tool. The defendant then forced L.G. and Moore into a corner of the dining room. Moore testified that her clothing had been covered in blood and that the blood had appeared to have come from her forehead. At this point, the defendant poured beer on L.G. and Moore and then urinated in their hair and faces.

L.G. and Moore then ran from the dining room into L.G.'s bedroom where the other two children had been sleeping. The defendant then entered the room and began asking Moore for money. Moore testified that she told the defendant she had asked Betty Douglas to keep some money for her and that the money was with Douglas. The defendant forced Moore to call Douglas and then he forced Moore, L.G., and the two young boys into the car and drove them to Douglas' home. Once at Douglas' home, Douglas gave the defendant some of Moore's money. The defendant returned to his car and left the area. Douglas then called for an ambulance. Moore was taken to Vanderbilt Hospital by ambulance and L.G. was taken to General Hospital by Douglas.

Moore, 1998 WL 9046, at ** 1-3. The state courts' other factual findings will be discussed in

the context of Petitioner's claims.

## E. Conclusions of Law

12

Petitioner's exhausted claims are governed by the provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). Linda v. Murphy, 521 U.S. 320, 336 (1997).

Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their

merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state

court judgment is "contrary to" clearly established federal law "if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court on a set of materially indistinguishable

facts " In such instances, the Supreme Court held that a federal habeas court may grant a writ.

Id. The Supreme Court interpreted the language "clearly established Federal law, as determined

by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its

decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is

"to apply a rule of law that was clearly established at the time the Petitioner's state court

conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003).

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal

court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials'

and to ensure that state court convictions are given effect to the extent possible under the law."

13

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

### 1. A State's Failure to Provide DNA for Testing

Based upon the Tennessee appellate court's findings quoted supra at pp. 3-5, the Court concludes that, Petitioner has failed to demonstrate that the state court's adjudication of his claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. This claim lacks merit.

### 2. Ineffective Assistance of Counsel

Petitioner's ineffective assistance of counsel claims are that: (1) trial counsel failed to arrange for independent testing of a saliva sample taken from the victims's mouth; (2) trial counsel failed to argue, in closing that Lucretia Gardner had admitted to authorities that Petitioner did not ejaculate during the rape; (3) that appellate counsel failed to raise on appeal the issue of counsel's refusal to instruct the jury on lesser included offenses; and (4) trial counsel prevented the Petitioner from testifying on his own behalf.

Petitioner raised substantially the same issues, among others, in his state post-conviction proceeding and the state trial court found that neither of Petitioner's trial counsel had been

14

ineffective. The state trial court's findings on these claims are as follows:

> The Petitioner alleges that he was denied effective assistance of legal counsel in violation of his rights under the United States and Tennessee Constitutions in that his legal counsel failed "to obtain a sample sufficient for independent testing . . . of fluids alleged to have been swabbed from the mouth of [the victim]." The Petitioner argues that such an omission prejudiced him because there is a "likelihood that independent testing would have excluded the Petitioner as the depositor of the alleged semen." According to the Petitioner's theory regarding specimen size, the State sought to subject the samples collected from the victim to two (2) methods of DNA testing: Restriction Fragment Length Polymorphism (hereinafter, "RFLP") and Polymerase Chain Reaction (hereinafter, "PCR").

> RFLP analysis is a DNA fingerprinting method that requires a relatively large sample of DNA. Comparatively, PCR analysis could be described as an amplification method of DNA fingerprinting which requires a significantly smaller sample of DNA. In PCR analysis, two (2) primers bearing the complementary sequences that are unique to the target of the forensic investigation are used to bind to the target DNA. This allows the DNA polymerase to extend the sequence between them, and each subsequent cycle produces a complementary DNA strand to the target. As a result, the product of each of these cycles is doubled, yielding an exponential increase in the number of genetic copies available to the laboratory. Simply put, RFLP requires a relatively large sample size -several dozen hairs or a nickel-sized blood stain -which PCR requires a much smaller sample size - a single hair or a single spermatozoa.

> The Petitioner asserts that, because the RFLP analysis was performed first, too little of the swab sample collected from the victim remained to yield a conclusive result, so the PCR test was never conducted -which may have excluded the Petitioner. The Petitioner argues that trial counsel were ineffective for failing to act in a timely manner to obtain a sample sufficient for independent testing, including an ABO blood-typing test, which could have also excluded the Petitioner. Both the RFLP and the PCR tests yielded inconclusive results.

> The second prong of the <u>Strickland</u> test requires a determination of whether legal counsel's deficient performance prejudiced the outcome of the case. <u>Strickland</u>, 466 U.S. at 693; <u>Baxter</u>, 533 S.W.2d at 936. Without abject evidence that samples were swapped and the Petitioner was implicated as a result of such a transgression, there is not a reasonable probability that the result may have been different. At present there is no such an assertion; moreover, the results of the tests were inconclusive rather than inculpatory in nature. The method by which the TBI handles and tests forensic evidence is not a matter within the control of trial counsel. Trial counsel's performance therefore, was not deficient and did not

15

prejudice the outcome of the case.

\* \* \*

The facts and pleadings convince this Court that counsel for the Petitioner did, in fact, conduct an adequate investigation into the facts of the underlying case, including the testing of the forensic evidence collected from the victim. Moreover, at the time of the trial in this matter, the TBI forensic lab did not have the capability to perform PCR testing; the TBI was capable only of conducing RFLP testing.

\* \* \*

2. The Petitioner alleges that trial counsel were ineffective for failing to move for a mistrial when, Leon Gardner, a witness for the State offered testimony beyond the bounds of the question submitted to him regarding a previous incident in which the Petitioner was alleged to have "struck or beaten" the mother of the victim.

As Petitioner notes in his Amended Petition for Post-Conviction Relief, trial counsel moved for and received a curative jury instruction regarding the testimony of Ruth Gardner. However, it is the position of the Petitioner that such an instruction focused the attention of the jury on the prejudicial testimony rather than the intended consequence of curing the defect.

This Court notes the several factors that can be considered in determining the question of whether a curative jury instruction is sufficient to avoid the declaration of a mistrial: "(1) whether the improper testimony was elicited by the State or whether it was a spontaneous declaration by the witness; (2) whether the case against the defendant was strong or weak; and (3) whether the trial court gave a prompt curative instruction." The Court noes a long line of case authority on this issue.

\* \* \*

This Court finds that the body of case law on the issue of curative instructions makes clear that the trial counsel's performance in the trial of the above-captioned matter was not deficient and did not prejudice the outcome of the case.

\* \* \*

3. The Petitioner alleges that trial counsel were ineffective for failing to adequately cross- examine Leon Gardner, a witness for the State, regarding the nature of his relationship with Petitioner.

16

The Petitioner claims that trial counsel were ineffective for failing to cross-examine Leon Gardner, the adolescent stepson of the Petitioner, the brother of the victim and the son of Ruth Moore. The Petitioner alleges that adequate cross-examination would have demonstrated that a "tumultuous relationship: existed between the Petitioner and his stepson and that this relationship would have revealed the witness bias and motive for make false accusations against the Petitioner. The Petitioner further alleges that it was his stepson who molested the victim and that trial counsel failed to adequately investigate this possibility.

The Petitioner's claim that trial counsel failed to investigate the facts and circumstance surrounding his stepson alleges that trial counsel made no effort to investigate the nature of the relationship between the Petitioner and his stepson and the fact that the Petitioner's stepson may have been the perpetrator of the molestations for which the Petitioner was convicted. In addition, the Petitioner argues that any personal facts, which may have called into question the credibility of Leon Gardner's testimony, would have aided the Petitioner's defense since Mr. Gardner's testimony was an integral component of the State's case.

The Petitioner has failed to prove by clear and convincing evidence that, had trial counsel investigated the issue of whether the Petitioner's stepson was, in fact, the perpetrator, such an investigation would have yielded the evidence the Petitioner claims exists.

\* \* \*

This Court notes also that at no time during the entirety of the trial proceedings against the Petitioner, did the Petitioner raise the issue of defense counsel's failure to investigate whether Leon Gardner could have committed the crimes for which the Petitioner was convicted, nor did the Petitioner raise the issue of defense counsel's failure to cross-examine on the issue of the alleged "tumultuous relationship" between the Petitioner and his stepson.

This Court is of the opinion that rial attacked the credibility of the testimony presented by the State's witnesses in every conceivable way. Further, this Court notes that, assuming the Petitioner's claims set forth in his Post-Conviction Petition that trial counsel did not investigate adequately the possibility that the Petitioner's stepson could have committed the crimes for which the Petitioner was convicted, the testimony given by Mr. Ray at the post-conviction hearing revealed his extensive knowledge of the case. Trial counsel's performance, therefore, was not deficient and did not prejudice the outcome of the case.

The above facts and pleadings convince this Court that counsel for the Petitioner did, in fact, conduct an adequate investigation into the facts of the underlying

17

case.

* * *

4. The Petitioner alleges that the trial counsel were ineffective for failing to investigate Leon Gardner, a witness for the State, in order to "develop evidence [of his] history of behavioral problems."

The prong of the Petitioner's claim that trial counsel failed to investigate the facts and circumstances surrounding his case that alleges that trial counsel's failure to investigate the personal and behavioral background of Leon Gardner may have supported the Petitioner's defense at trial. The Petitioner alleges that trial counsel's failure to investigate resulted in prejudice to the Petitioner rising of a level of ineffective assistance of counsel.

* * *

This Court notes also that at no time during the entirely of the trial proceedings against the petitioner, did the petitioner raise the issue of defense counsel's failure to investigate or to present evidence of Leon Gardner's alleged history of behavior problems.

This Court is of the opinion that trial attacked the credibility of the testimony presented by the State's witnesses in every conceivable way. Trial counsel's performance, therefore, was not deficient and did not prejudice the outcome of the case. Finally, this Court notes that this issue has already been raised and litigated on Petitioner's direct appeal to the Tennessee Court of Criminal Appeals. The Court of Criminal Appeals affirmed the conviction of the Petitioner and dismissed the above-alleged ground.

The above facts and pleadings convince this Court that counsel for the Petitioner did, in fact conduct an adequate investigation into the facts of the underlying case, including the testing of the forensic evidence collected from the victim. Trial counsel's performance, therefore, was not deficient and did not prejudice the outcome of the case.

* * *

5. The Petitioner alleges that trial counsel were ineffective in their cross-examination of Officers Morris and Rolland, both State's witnesses.

The Petitioner calms that rial counsel's cross-examination of State's witnesses, Officers Roy Morris and Mike Rolland, were ineffective in that they elicited

18

hearsay contained in the police reports that would have been inadmissible otherwise. Specifically, the Petitioner claims that "specific complaints of the female prosecuting witnesses made to police near to the time of the events in question" amounted to inadmissible hearsay testimony. It is the position of the Petitioner that such testimony only "bloster[ed] the credibility of these complaints by revealing the existence of prior consistent statements."

*   *   *

In the present case, the Petitioner's own trial counsel elicited the statements on cross-examination, which the Petitioner now seeks to hold harmful as a ground for his claim of ineffective assistance of trial counsel. However, this Court notes that the Tennessee Court of Criminal Appeals reviewed the trial record in is entirely and not error on this issue has been noted. As such, this Court finds that trial counsel's performance was not deficient and did not prejudice the outcome of the case.

*   *   *

6. The Petitioner alleges that trial counsel were ineffective, because their cross-examination of the TBI forensic serologist was inadequate.

The Petitioner asserts that trial counsel's cross-examination of the TBI forensic serologist who examined the samples collected from swabs of the mouth of the victim was inadequate. Specifically, the Petitioner claims that, because the serology report did not indicate the presence of semen, "[t]rial counsel failed to exploit this discrepancy."

This Court notes that all issues surround the TBI forensic serologist, including the issue of the sample size and the resulting reports, have been raised and litigated already on Petitioner's direct appeal to the Tennessee Court of Criminal Appeals. The Court of Criminal Appeals affirmed the conviction of the Petitioner and dismissed the above-alleged ground. For this reason, the above facts and pleadings convince this Court that counsel for the Petitioner did, in fact, conduct and adequate cross-examination of the State's witnesses against him. This Court finds that trial counsel's performance, therefore, was not deficient and did not prejudice the outcome of the case.

*   *   *

7. The Petitioner alleges that trial counsel "failed to exploit a conspicuous flaw in the prosecution's case as to the count of the indictment involving alleged penile/oral penetration" in the closing argument.

19

The proof in the underlying trial in the above-entitled cause established that the victim was raped between 1:00 and 4:00 a.m. on November 27, 1993. The proof also established that the physical examination of the victim in which the oral swab was conducted to obtained a sample occurred at 8:30 a.m. on that same day - approximately four and one-half (4½) to seven and one-half (7½) hours after the attack.

Trial counsel's performance, therefore, was not deficient and did not prejudice the outcome of the case. Finally, this Court noes that this issue has already been raised and litigated on Petitioner's direct appeal to the Tennessee Court of Criminal Appeals. The Court of Criminal Appeals affirmed the convictions and sentences of the Petitioner and dismissed the above-alleged ground.

The above facts and pleadings convince this Court that counsel for the Petitioner did, in fact, conduct an adequate investigation into the facts of the underlying case, including the testing of the forensic evidence collected from the victim.

\*    \*    \*

The Petitioner's final claim in his prayer for relief alleges that, because on of Petitioner's trial counsel was under investigation by the same prosecutor's office that was pursuing the prosecution of the Petitioner, the trial court should have made inquiry regarding, in the very least, the potential for such a conflict.

A brief history of the investigation of Mr. Hughes is necessary to understand that nature of this ground of Petitioner's Petition.

In 1993, Wayford Demonbreun retained Dennis J. Hughes, on of this Petitioner's trial counsel, to defend him in a first degree murder trial in the murder of Naron Allen. Rhonda Williamson, was the murder victim's girlfriend and was sitting beside him in a car when Demonbreun shot and killed Allen on November 3, 1993. Williamson told Rhoda Cecil, an employee of the Metropolitan Nashville Police Department Domestic Violence Division, that Dennis Hughes and Suvonnya Lakesha Smith, Demonbreun's girlfriend, had approached her about changing her story in return for money. Cecil then called the District Attorney General's office, and an investigation into Williamson's complaint ensured. Mr. Hughes was convicted after a trial by a jury of bribery of a witness and conspiracy to commit bribery.

The Petitioner avers that the trial court knew or should have known that Mr. Hughes was the subject of a criminal investigation by the office of the Davidson County District Attorney during the pendency of the litigation of this matter. The Petitioner argues that the trial court should have inquired about the conflict of

20

interest, or, in the very least, the potential for a conflict of interest, between the Petitioner and trial counsel. This Court finds such an argument tenuous, at best. To suggest that trial counsel and the Petitioner had conflicting interests regarding the criminal investigation of Mr. Hughes on an unrelated matter, assumes facts not in evidence at the hearing on the Petitioner's Post-Conviction Petition. Specifically, the Petitioner, who bears the burden of proof failed to present any evidence that Mr. Hughes was even aware of the criminal investigation into his activities relative to the Demonbreun case during the Petitioner's trial. Further, the Petitioner failed to present any evidence that the trial court knew or should have been aware of a criminal investigation into Mr. Hughes' activities as the related to a totally different criminal case.

The Court further finds that irrespective of Mr. Hughes' involvement, that the representation of the Petitioner by Mr. Ray was thorough and beyond question. Mr. Ray did an excellent job, preserved all relevant issues for appeal, and ultimately prevailed on the severance issue before the Tennessee Supreme Court. That the issue was considered harmless by the Court was not the fault of defense counsel.

(Docket Entry No. 45-12, Technical Record at pp. 40-41, 42, 43-44, 45, 46, 47, 48, 49)[3]

In Petitioner's post-conviction appeal, the Tennessee Court of Criminal Appeals

described and decided these claims as follows:

In this appeal, the petitioner asserts that he did not receive the effective assistance of counsel at trial or on appeal. Specifically, he claims that his two attorneys were ineffective for failing to obtain and test a sample of fluids swabbed from the mouth of L.G.; failing to ask for a mistrial after state witness Leon Gardner testified about a prior bad act; failing to adequately investigate and cross-examine Leon Gardner; failing to adequately cross-examine the investigating officers and the TBI serologist; failing to exploit during closing argument a "conspicuous flaw" in the state's case; and failing to raise on direct appeal the trial court's failure to instruct on certain lesser included offenses. The petitioner also asserts that his trial counsel prevented him from testifying on his own behalf.

In a twenty-seven page order, the post-conviction court determined that neither Attorney Charles Ray nor Attorney Dennis Hughes ineffectively represented the petitioner. Further, the post-conviction court found that many of the grounds for relief raised in the petition had been presented and rejected on direct appeal and were, therefore, previously determined. See Tenn.Code Ann. § 40-30-206(h)

---

[3]The pages cited also reflect the pages in the Court's electronic filing system.

21

(1997).FN1

FN1. In 2003, the Post-Conviction Procedure Act was renumbered within the Code. It now appears at sections 40-30-101 through 40-30-122.

With regard to the petitioner's claim that his trial counsel should have obtained a fluid sample for DNA testing, the post-conviction court determined that the petitioner had failed to establish that he was prejudiced because the results of DNA testing conducted by the state were inconclusive rather than inculpatory. With regard to the claims concerning the testimony of Leon Gardner, the post-conviction court determined that because a curative instruction was given after the offending testimony, a mistrial was not warranted. The post-conviction court determined that the petitioner failed to establish that "had trial counsel investigated the issue of whether [Leon Gardner] was ... the perpetrator, such an investigation would have yielded the evidence the [p]etitioner claims exists." The post-conviction court concluded that trial counsel "attacked the credibility of the testimony presented by the [s]tate's witnesses in every conceivable way." The post-conviction court also observed that questioning of Attorney Ray at the evidentiary hearing "revealed his extensive knowledge of the case."

\* \* \*

A petitioner seeking post-conviction relief on the basis of ineffective assistance of counsel must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn.1996).

In this instance, the petitioner has failed to include in the record a transcript of the hearing on his post-conviction petition. After the docketing of the case and the assignment for disposition, this court ordered that the record be supplemented

22

with the transcript of the evidentiary hearing within fifteen days. The clerk of the trial court failed to comply with the order within the time specified and did not seek an extension of time for filing the supplement. Despite being given notice that the record was inadequate, the petitioner did not ask for supplementation. Over one month after its due date, a transcript of the evidentiary hearing was sent to this court by the clerk of the trial court. Because the filing of the transcript was not timely, the staff attorney for this court contacted counsel for the petitioner and asked that she file a motion to late file the transcript as a supplement. No action has been taken.

It is the duty of the appellant to prepare a record which conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal. Tenn. R.App. P. 24(b); Groseclose v. State, 615 S.W.2d 142 (Tenn.1983); State v. Miller, 737 S.W.2d 556, 558 (Tenn.Crim.App.1987). In the absence of an adequate record on appeal, this court must presume that the rulings of the post-conviction court were correct. State v. Keen, 996 S.W.2d 842 (Tenn.Crim.App.1999); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn.Crim.App.1979). Because the petitioner failed to include the transcript of the evidentiary hearing which was the basis for the post-conviction court's ruling, our duty is to presume that the evidence does not preponderate against the post-conviction court's determination that the petitioner received the effective assistance of counsel. Further, there is no indication that the contents of the transcript lodged would have required a different result.

Moore, 2004 WL 1144015, at **1, 2, 3.

As to his counsel's alleged conflict of interests, the trial court made express findings of the lack of any tie between Petitioner and his trial counsel's subsequent criminal proceeding quoted supra at pp. 30-31. The Tennessee Court of Criminal Appeals ruled that Petitioner did not present proof on this issue, that the evidence did not show defense counsel's awareness of this alleged conflict; and that the cited conflict would not have had any impact on the Petitioner's trial. 2004 WL 1144015, at *5 (quoting the state trial court's ruling).

The Sixth Circuit summarized Supreme Court precedents and identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at a critical stage of the proceeding for which a presumption of prejudice arises; and (2)

23

counsel whose performance was deficient on specific issues and that deficiency was demonstrably prejudicial to the defendant. As that Court explained:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391(citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).

Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir. 2003).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742.

In Carrier, the Supreme Court ruled that absent an error of constitutional magnitude, trial strategy decisions of counsel do not establish cause, unless the decision is of constitutional significance. Carrier, 477 U.S. at 486-88 (citing Engle v. Isaac, 456 U.S. 107, 133-34 (1982)). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to

24

raise the claim despite recognizing it, does not constitute" prejudice. <u>Carrier</u>, 477 U.S. at 486. As to failure to raise an issue on appeal, "[t]his process of 'winnowing out weaker arguments on appeal and 'focusing on those more likely to prevail, far from being evidence on noncompliance, is the hallmark of effective appellate advocacy." <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986)(quoting <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983).

Here, from the review of the state court record, the Court concludes that Petitioner's ineffective assistance of counsel claim falls under the <u>Strickland</u> standard. As reflected in the quoted portions of the state trial court's and the Tennessee Court of Criminal Appeals' decisions, Petitioner's trial counsel's cited failures, including the decision not to object to the jury's incomplete finding of aggravating circumstance, was a strategic decision. Under <u>Carrier</u>, this strategic decision would not be actionable. Similarly, the appellate counsel's failure to raise an issue on appeal is a strategic decision that is not ground for habeas relief. The Tennessee Court of Criminal Appeals' decisions on these claims are not unreasonable.

In addition, that state court also concluded that any deficiency in trial counsel's failures was not ground for relief due to Petitioner's lack of any showing of prejudice. To establish prejudice for counsel's errors or omissions, Petitioner must establish a reasonable probability that, but for counsel's unprofessional errors, the result of his trial would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." <u>Id.</u> The State record does not establish any prejudice due to the alleged failures of Petitioner's trial and appellate counsel.

25

As to the cited conflict of interest, the state trial court did not find any connection between one of Petitioner's trial counsel's subsequent criminal conduct and the Petitioner's trial. For a conflict of interest to establish ineffective assistance of counsel, Petitioner must show that at the time of his counsel's representation, his counsel was also actively representing a conflicting interest. Strickland, 466 U.S. at 692. No such showing is present here.

Given the facts in the state record and Petitioner's role in the offense, the Court concludes that the Tennessee's courts' finding on the lack of prejudice on Petitioner's ineffective assistance of counsel's claims was a reasonable application of federal law.

### 3. Sufficiency of the Evidence

Petitioner raised this claim on direct appeal and the Tennessee appellate court applied the federal standard to conclude that evidence established "the essential elements of the crime beyond a reasonable doubt." Moore, 1998 WL 209046, at *8. In its review, the Tennessee Supreme Court also held the evidence was "more than sufficient" to support Petitioner's child rape conviction. Moore, 6 S.W.3d at 242-43. In its ruling, the Tennessee Court of Criminal Appeals cited the pertinent evidence on this claim:

> [T]he defendant contends that the evidence was insufficient to convict him of count two, rape of a child. As noted earlier, of the three charges of rape of a child, the defendant was convicted of only one count. This count related to the victim being forced to perform fellatio on the defendant. The defendant contends that the evidence is insufficient because the victim offered conflicting testimony in that she said in an earlier statement the defendant did not ejaculate in her mouth and because the source of the semen found in the victim's mouth could not be successfully identified.
>
> A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This Court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences

26

which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982).

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether " any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn.1973).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." T.C.A. § 39-13-522. Fellatio is included within the definition of sexual penetration. T.C.A. § 39-13-501(7). At the time of the offense, L.G. was eleven years old.

At trial, L.G. testified to a string of horrific events that occurred during the early morning hours of November 27, 1993. With respect to this charge, she testified that the defendant had tied her mother to a pole in the basement and had then taken her [L.G.] upstairs, had forced her on her knees, and had put his penis in her mouth. Her testimony was corroborated by the testimony of Leon Gardner and Betty Douglas. As discussed above, these witnesses were allowed to testify as to what L.G. said shortly after the incident occurred. Both stated that L.G. had said the defendant had put his penis in her mouth.

Furthermore, Julie Rosof, a family nurse practitioner at Our Kids Center, testified that she had performed a physical examination of L.G. including taking mouth and throat swabs. These swabs were then sent to the TBI lab where forensic serologist Deane Johnson examined them. Johnson testified that she had found semen on the oral swab taken from L.G.

Joe Minor, who performs casework for the TBI in DNA matters, testified that he had compared the semen sample found in L.G.'s mouth to a saliva sample

Case 3:06-cv-00333   Document 50   Filed 07/30/09   Page 27 of 29 PageID #: 2122

provided by the defendant. He explained that he could make no match due to the insufficient amount of the semen sample.

From this evidence, we find it entirely permissible for the jury to have convicted the defendant of rape of a child by means of fellatio. The jury chose to credit the testimony of the victim, despite an earlier statement in which she had said the defendant did not actually ejaculate. The jury also chose to credit the testimony of Leon Gardner and Betty Douglas. In addition, physical evidence showed semen in the victim's mouth. That the small amount of semen could not be successfully matched to the defendant is of little consequence. The presence of the semen combined with the testimony of the victim and other witnesses is clearly sufficient to sustain the defendant's conviction on this count. This issue is without merit.

Moore, 1998 WL 209046 at *7-9.

The appellate state courts applied the controlling federal standard and the record reasonably supports their conclusions. Petitioner has failed to identify evidence to overcome the presumption of correctness of these findings under 28 U.S.C. § 2254(e)(1). Petitioner has failed to demonstrate that the state court's adjudication of his claim involved an unreasonable application of clearly established federal law. This claim is without merit.

#### 4. State Court's Failure to Reopen

As to Petitioner's claims for the state court's failure to reopen the evidence in his state post-conviction, Petitioner fails to state a claim as this claim involves an application of state law. Since there is no constitutional right to post-conviction review that warrants federal habeas relief. See Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990 (1987).

#### 5. Multiplicity Claims

Petitioner's multiplicity claim is that the trial court erred in failing to sever certain counts of his indictment because the offense did not constitute "parts of a common scheme or plan" as required under Tenn. R. Crim. P. 8(b). After applying Tennessee law on permissive joinder of

28

offenses, the Tennessee Court of Criminal Appeals concluded that "the trial court did not err by refusing to sever the charges," but that any error would have been harmless in any event, since the evidence was "entirely sufficient to support the defendant's conviction for rape of a child." Moore, 1998 WL 209046, at *6. The Tennessee Supreme Court granted review "to address the proper application of Tennessee Rule of Criminal Procedure 14(b)(1), which is used to sever criminal offenses." Moore, 6 S.W.3d at 237.

Although the State Supreme Court concluded that the trial court had abused its discretion on the severance issue, the Tennessee Supreme Court found the error to be harmless. Id. at 243. The court considered Petitioner's severance contention as a state law question of evidence. Petitioner did not present this claim in the state courts as a federal claim nor did the Tennessee Supreme Court consider the claim under federal law. (Docket Entry No. 45-11, Briefs at pp. 20-23 and pp. 104-07). This claim was not fairly presented to the state courts as a federal claim and cannot serve as a basis for federal habeas relief in this action.

### 6. Apprendi Sentencing Claim

Petitioner relies upon Apprendi for this claim, but the Respondent asserts the procedural default defense to this claim. Petitioner was sentenced on September 11, 1996 (Docket Entry No. 45-1 at pp. 126-133). Apprendi was decided in 2001 and is not retroactive. Goode v. United States, 306 F.3d 378, 382-85 (6th Cir. 2002).

For the above stated reasons, the Court concludes that the petition should be denied and this action dismissed with prejudice.

An appropriate Order is filed herewith.

ENTERED this the __29th__ day of July, 2009.

WILLIAM J. HAYNES, JR.

29